[No. 28786-9-I.    Division One.    June 7, 1993.]

FLORENCE D. COLEMAN, ET AL, *Appellants,* v. ERNST HOME
CENTER, INC., *Respondent.*

*Mark C. Mostul* and *Skellenger, Bender, Mathias & Bender,* for appellants.

*Sharon J. Bitcon, John P. Mele,* and *Ryan, Swanson & Cleveland,* for respondent.

KENNEDY, J. — Appellants, Police Officer Florence Coleman and her husband Richard Coleman,[1] brought a personal

---

[1]Mr. Coleman is joined as a party plaintiff. However, for ease and clarity in discussing the facts of the case, Officer Florence Coleman will be referred to as the appellant.

injury claim against Ernst Home Center, Inc. (Ernst) based on injuries Officer Coleman sustained in tripping and falling on Ernst's entryway carpet. The court granted a directed verdict after the close of the appellant's case. Appellant now appeals that ruling along with a number of evidentiary rulings. We affirm.

## FACTS

Officer Coleman alleges that, on October 4, 1986, while on duty as a police officer, she was leaving Ernst's Aurora Square store after looking for a robbery suspect when she tripped in a hole in the tire-mat carpeting and fell in the entryway of the store. Medical experts testified that Coleman received trauma to her neck and shoulders from the fall. After the fall, Officer Coleman told a cashier that she wanted to talk to a manager about the dangerous condition. Adele Sanders, the nursery department manager at that time, came and talked to Officer Coleman about the accident.

Officer Coleman showed Ms. Sanders the area of carpet where several pieces were missing. The hole in the carpeting left by the missing pieces was at least 12 inches long and 3½ inches wide. Officer Coleman stated that she did not see the hole before she stepped into it and was concerned that others might not see the hole and be injured.

Ms. Sanders found the missing carpet pieces lying in the entryway and took them to the receiving room. Ms. Sanders testified that she immediately told employees to fix the carpeting because the hole was dangerous. However, she also testified that the carpeting was not repaired until 9 p.m. when the store was closed and the night stockers came on duty. There was no evidence presented concerning whether the carpeting reasonably could have been repaired prior to the store's closing.

Ms. Sanders also testified that she knew of two or three other instances over the 4½ years she had been employed at the store by the time of trial when the carpeting had become loose or had pieces missing. It is not clear whether these instances were before or after Officer Coleman's fall. Ms.

Sanders was not asked whether any of these incidents of loose carpeting occurred before Officer Coleman fell.

Ms. Sanders also testified that employees did not always immediately report or repair this type of problem, although they were supposed to at least promptly report any such dangerous conditions. In addition, Ms. Sanders testified that regular safety inspections were done only once a day, at 9 a.m. before the store opened. She also testified that there was extra carpet in the receiving room, left over from when the carpeting was installed.

Although the entryway carpeting was 8 to 10 feet away from a cashier station, there is no evidence that any cashier, or any other store employee, actually saw the hole in the carpeting before Officer Coleman fell. There is no clear evidence concerning what caused the carpet pieces to come loose or as to how long the hole in the carpeting had been present before Coleman tripped. Coleman testified that she did not notice the hole when she entered the store. She noticed the hole as she left the store only because it caused her to trip and fall.

Randy Neuert, the manager of Ernst's Aurora Square store, at the time of the accident and at the time of the trial, testified that the carpeting was tough, held down with adhesive and not easily removed.

After the close of Coleman's case, Ernst moved for a directed verdict. Ernst argued that Coleman had failed to produce sufficient evidence that Ernst had notice of the dangerous condition of its entryway carpet. After hearing extensive argument, the court granted Ernst's motion. The court entered a directed verdict in favor of Ernst on June 5, 1991. This appeal followed.

## DISCUSSION

### A. Actual or Constructive Notice of the Danger

Coleman contends that, because Ernst is a self-service store, dangerous conditions are constant and foreseeable and, therefore, she was not required to establish that Ernst

had actual or constructive notice of the dangerous condition that caused her injury. We disagree.

■ In Washington the general rule governing liability for failure to maintain business premises in a reasonably safe condition requires that the plaintiff prove (1) the unsafe condition was caused by the proprietor or its employees, or (2) the proprietor had actual or constructive knowledge of the dangerous condition. *Pimentel v. Roundup Co.*, 100 Wn.2d 39, 49, 666 P.2d 888 (1983).

In addition, a proprietor of a self-service business operation has a duty to exercise reasonable care against any increased danger that is caused by, or due to, the operation of its particular business. *Ciminski v. Finn Corp.*, 13 Wn. App. 815, 819-20, 537 P.2d 850, 85 A.L.R.3d 991, *review denied*, 86 Wn.2d 1002 (1975). Therefore, a narrow exception to the notice requirement is sometimes applicable to self-service stores. This exception was analyzed and adopted by the Washington Supreme Court in *Pimentel*.

In *Pimentel* a woman was looking at magazines in a self-service store when a can of paint fell on her foot. The trial court held that plaintiff had to prove actual or constructive knowledge of the unsafe condition. The Court of Appeals reversed and was affirmed by the Supreme Court, which held that:

> where the operating procedures of any store are such that unreasonably dangerous conditions are continuous or reasonably foreseeable, there is no need to prove actual or constructive notice of such conditions in order to establish liability for injuries caused by them.

*Pimentel*, at 40.

The restriction in *Pimentel* was further clarified in *Wiltse v. Albertson's, Inc.*, 116 Wn.2d 452, 805 P.2d 793 (1991). In *Wiltse* the plaintiff slipped on water that had dripped from a leak in the defendant store's roof. The *Wiltse* court found that the hazard was unforeseeable and in no way related to the store's self-service operation. *Wiltse*, at 456. Specifically, the court held that:

The *Pimentel* rule does not apply to all self-service operations, but only if the particular self-service operation of the defendant is such that it is reasonably foreseeable that unsafe conditions *in the self-service area* might be created.

(Italics ours.) *Wiltse*, at 456. The court went on to explain:

> *Pimentel* speaks to specific self-service operations and specific operating procedures of the store. *Pimentel* realized that *certain departments of a store, such as the produce department,* were areas where hazards were apparent and therefore the owner was placed on notice by the activity. Hence, the actual cause of the hazard is relevant in establishing whether the unreasonably dangerous condition was continuous or reasonably foreseeable because of the *specific* self-service operation. Because *Pimentel* is a *limited rule* for self-service operations, not a per se rule, the rule should be limited to specific unsafe conditions that are continuous or foreseeably inherent in the nature of the business or mode of operation.

(Italics ours.) *Wiltse*, at 461.

In the present case, after hearing extensive argument, the trial court held that the *Pimentel* exception did not apply and dismissed appellant's suit after holding that she had failed to submit sufficient evidence of actual or constructive notice.

■ Coleman asserts that the question of whether the operating procedures of a defendant's store are such that unreasonably dangerous conditions are continuous or reasonably foreseeable is a jury question. However, the applicability of the *Pimentel* exception is a question of law, appropriately decided by the trial court. *See Wiltse*, at 456, 461. In addition, the trial court must decide if there is sufficient evidence to submit to the jury.

Next, Coleman contends that the tire carpeting was directly related to Ernst's self-service operation. Specifically, she argues that, but for Ernst's large sales volume, low overhead and minimum number of employees, Ernst would not have a linoleum floor and a tire-tread entryway carpeting. The purpose of the carpet, she asserts, is to collect moisture and dirt which a large volume of customers would track in. Even if this is true, the present case is distinguishable from *Pimentel*.

■ Here, the entryway carpeting was not part of Ernst's self-service area or department. Self-service departments are areas of a store where customers serve themselves. In such areas, where lots of goods are stocked and customers remove and replace items, "hazards are apparent". *See Wiltse*, at 461 (hazards are apparent in self-service areas such as produce department). Similar hazards are not apparent with heavy-duty entryway carpeting.

Moreover, heavy rubber carpeting is often found in the entryways of schools, hotels, hospitals and businesses that have a large volume of pedestrian traffic. This does not make these premises "self-service". In sum, the trial court ruled correctly in finding that the *Pimentel* exception did not apply.

## B. Sufficiency of Evidence To Present Jury Question

Coleman contends that the trial court erred in holding that there was insufficient evidence to present a jury question concerning whether Ernst had constructive notice of the unsafe condition. We disagree.

■ In reviewing a directed verdict on appeal, the appellate court engages in the same inquiry as the trial court and determines whether the trial court correctly applied the law. *Jones Assocs., Inc. v. Eastside Properties, Inc.*, 41 Wn. App. 462, 704 P.2d 681 (1985). On a motion for directed verdict, all inferences which can reasonably be drawn must be drawn against the moving party and in favor of the opposing party. *Moyer v. Clark*, 75 Wn.2d 800, 803, 454 P.2d 374 (1969). *See also Bertsch v. Brewer*, 97 Wn.2d 83, 90, 640 P.2d 711 (1982); *Messina v. Rhodes Co.*, 67 Wn.2d 19, 20, 406 P.2d 312 (1965).

> No element of discretion is vested in the trial court in ruling upon the motion. If there are justifiable inferences from the evidence upon which reasonable minds might reach conclusions that would sustain a verdict, then *the question is for the jury, not for the court*. The motion may be granted only if it can properly be said as a matter of law that there is *no* evidence or reasonable inference therefrom to sustain a verdict for the nonmoving party.

220

(Italics ours.) *Moyer*, at 803. *See also Harrison v. Whitt*, 40 Wn. App. 175, 178-79, 698 P.2d 87, *review denied*, 104 Wn.2d 1009 (1985).

■ ■ The applicable rules regarding constructive notice are set forth in *Morton v. Lee*, 75 Wn.2d 393, 397, 450 P.2d 957 (1969):

> Ordinarily, it is a question of fact for the jury, whether under all of the circumstances, a defective condition existed long enough so that it would have been discovered by an owner exercising reasonable care. The permissible period of time for the discovery and removal or warning of the dangerous condition is measured by the varying circumstances of each case. To a large extent, it depends upon the opportunity for discovery open to the defendant's employees by reason of their number, their physical proximity to the hazard, and, in general, the likelihood they would become aware of the condition in the normal course of duties. The decisive issues, therefore, are the length of time the condition is present and the opportunity for discovery under the circumstances proved. While the plaintiff must prove that the defective condition existed long enough so that by the use of reasonable care it should have been discovered and remedied, that fact, like other facts, may be proved by circumstantial as well as by direct evidence.

(Citations omitted.) However, where circumstantial evidence leads only to speculation, a verdict cannot be based on inferences drawn from the evidence. *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 148, 381 P.2d 605, 96 A.L.R.2d 1193 (1963); *Falconer v. Safeway Stores, Inc.*, 49 Wn.2d 478, 479, 303 P.2d 294 (1956); *Harrison*, 40 Wn. App. at 177.

Coleman further asserts that, although it is unclear how long the dangerous condition existed here, Ernst's inadequate inspection and housekeeping procedures raise a question of fact for the jury concerning constructive notice. We disagree.

To begin, the length of time that a danger has existed has been viewed as an important consideration in slip-and-fall cases similar to Coleman's. In *Presnell v. Safeway Stores, Inc.*, 60 Wn.2d 671, 374 P.2d 939 (1962),[2] the plaintiff slipped

---

[2] The other cases Ernst relies on to argue its constructive notice theory are not on point. In *Falconer v. Safeway Stores, Inc.*, 49 Wn.2d 478, 303 P.2d 294 (1956), the jury verdict for the plaintiff was affirmed by the Supreme Court on the basis

on a banana peel in a Safeway store. Evidence was presented that the peel was dark in color and the floor was dirty and cluttered with paper and wrappers. Plaintiff's companion and a store employee testified that they saw no one eating bananas in the store prior to the accident. The Supreme Court affirmed a jury verdict for the plaintiff, finding that the color of the peel and dirt on the floor created a reasonable inference that the peel had been on the floor for a considerable time. *Presnell*, at 673-74. Here, in contrast, Coleman fails to present any evidence at all concerning how long the dangerous condition existed.

Still, as Coleman points out, housekeeping procedures have on at least one occasion been found to present a jury question concerning whether the defendant store exercised ordinary care. In *Morton*, a woman slipped on an apricot which had fallen from a display stand located on the walkway outside the entrance of a store where she was shopping. Her husband had testified that when he went into the store he did not see the apricot. But when he left the store 5 minutes before his wife left he saw the apricot on the ground. Thus, the circumstantial evidence suggested that the apricot had been on the ground at least 5 minutes. The defendant store argued that 5 minutes was insufficient as a matter of law to establish constructive notice.

The Supreme Court affirmed the trial court's denial of defendant's motion for directed verdict, stating that:

> To hold for [the store] on the issue, as a matter of law, would compel us to ignore entirely the issue of *whether [the store's] housekeeping procedures and practices, with respect to the display stand and the surrounding area, met the standard of care that an ordinarily careful and prudent store owner would have deemed reasonably adequate under the same circumstances.* The resolution of that issue was for the jury, not this court. It appears to us that reasonable minds could differ.

(Italics ours.) *Morton*, 75 Wn.2d at 397-98.

---

that the circumstantial evidence inferred that the defendant had actually caused the unsafe condition. Here, there is no evidence that Ernst caused the condition. *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 381 P.2d 605, 96 A.L.R.2d 1193 (1963) dealt with medical negligence.

However, we find that *Morton* governed the narrow exception to establishing actual or constructive notice *before* our Supreme Court adopted the *Pimentel* exception. The issue of the adequacy of the housekeeping procedures in *Morton* was for the jury simply because there were apricots in a bin right at the store entrance, which *foreseeably* would be dropped right where the offending apricot *was* dropped. Thus, *Morton* was actually a foreseeability case. No one could seriously argue that the store had a duty to inspect the entryway in *Morton* every 4½ minutes, or even every 5 minutes. *Pimentel* was the end result of the *Morton*-type situation, and *Pimentel* now governs self-service departments like the one in *Morton*. *Morton* has little additional utility today and is inapposite to the notice issues in this case.

█ Liability can certainly be established by a showing that the operator of the premises failed to conduct periodic inspections with the frequency required by the foreseeability of the risk. *Pimentel*, at 49. This liability depends on the circumstances.

> [The] owners and proprietors of a store[] have a duty to exercise reasonable care to keep those portions of the premises used by their customers in a reasonably safe condition, or to warn the customer-invitees of the dangerous condition known or which should have been known to the owner and which is not known or reasonably discoverable by the invitee.

*Baltzelle v. Doces Sixth Ave., Inc.*, 5 Wn. App. 771, 774, 490 P.2d 1331 (1971). "However, owners of property are not insurers against all happenings that occur on the premises." *Fernandez v. State ex rel. Department of Hwys.*, 49 Wn. App. 28, 36, 741 P.2d 1010 (1987).

█ Rather, the owner's duty is to exercise reasonable care for the invitee's protection. That obligation of reasonable care extends to everything that threatens the invitee with an *unreasonable* risk of harm. W. Prosser, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on Torts* 425 (5th ed. 1984). The shopkeeper has a duty to inspect to discover possibly dangerous conditions of which he does not know and take reasonable precautions to protect the invitee from

dangers that are foreseeable from use of his property. *Smith v. Manning's, Inc.*, 13 Wn.2d 573, 580, 126 P.2d 44 (1942). But there is no liability for harm from conditions from which no *unreasonable* risk was to be anticipated. *See Greenfield v. Freedman*, 328 Mass. 272, 275, 103 N.E.2d 242, 244 (1952); *Sheridan v. Great Atl. & Pac. Tea Co.*, 353 Pa. 11, 13, 44 A.2d 280, 281, 162 A.L.R. 946 (1945); *Prosser and Keeton on Torts,* at 426.

█ We cannot fall back on *Morton's* "adequacy of housekeeping is a jury question" rationale here. The adequacy of housekeeping procedures *is* a jury question. However, there must first be some evidence, in this case, from which a rational trier of fact could infer that to inspect only once a day, just before 9 a.m., was not adequate because the known frequency of loosened tire strips required greater vigilance. Such evidence was not presented.

Here, there is evidence that in the 4½ years Sanders had worked for the store by the time of trial, strips had come loose two or three times. Although we do not know whether any of those times were before Coleman fell, even if strips had come loose one or more times before the fall and the store employees knew it, this is not the kind of risk from which any rational trier of fact could determine that a once a day inspection is inadequate. The testimony established that these rubber mats are heavy duty, glued down, and hard to rip up from normal usage. Clearly these strips do not come loose very often — no doubt a factor indicating why they so often are used in high-volume entryways.

We stop short of saying that inspecting the kind of carpeting here at issue once a day is enough as a matter of law in *all* circumstances. However, we can and do say as a matter of law that for a reasonable jury to be able to find liability here, there would have to be evidence from which to find that once a day is *not* enough. That evidence is not in this record.[3]

---

[3] If there were evidence that the store *caused* the problem, for example, by moving heavy pallets in and out, that would be a different issue. Coleman tried

All of this being so, Coleman did have to show either that Ernst (1) caused the danger, (2) actually knew about the hole and did nothing to remedy the danger, or (3) had constructive notice of the danger. *Pimentel*, 100 Wn.2d at 49. Constructive notice could be established by proving that (a) the strips had come loose long enough before the fall that a reasonably prudent shopkeeper with adequate housekeeping procedures would have found the hole, or (b) there was an *unreasonable* risk of these strips coming up so that a reasonably prudent shopkeeper would know he had to inspect *more than* once a day. Coleman failed to present evidence on any of these theories of liability.

The fact that the store employees could not be counted on to observe, report, or repair loose strips, and the fact that even after Coleman fell, it was 3 hours before the carpeting was repaired beg the actual questions at issue.[4]

We affirm the trial court's determinations that the *Pimentel* exception does not apply and that there was insufficient evidence of constructive notice to submit to the jury.

A majority of this panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

PEKELIS, A.C.J., and BAKER, J., concur.

---

to show this by offering Ernst's corporate loss prevention and risk manager Lewis Wohlford's testimony. However, the trial court considered Wohlford's deposition just prior to the dismissal and determined that the testimony would not tend to establish that the store had caused the danger. Because we do not have the deposition, we cannot review that determination.

[4] As pointed out by the trial court, there is no testimony that it could have been practical to have fixed the carpeting before closing, in any event.